Good morning, Your Honors, and may it please the Court, I'm John Bessie of the Center for Biological Diversity for the Appellants and Plaintiffs. There's a good variety of factual information that's been developed in the record in this case, but the case fundamentally involves more of a legal issue, the question of a legal standard. And although the parties don't appear to disagree as to what that standard is, there is disagreement as to the Fish and Wildlife Service's application of that standard. Well, I learned something from this case. I never knew there was a giant earthworm, so I've been educated. There's larger ones in Australia. If any of us are lucky to see any of these, I think it would be a great thing, which is perhaps becoming more and more in doubt. So the standard here embodies a precautionary principle that runs throughout the Endangered Species Act. And we see this in the context of the species listing process in the Defenders of Wildlife v. Babbitt case, where the Court recognized that sometimes the Fish and Wildlife Service must act in the face of imperfect information, because if it waits for perfect information or for better information, it may be too late to protect the species. But the problem for me with your case is that there is so little information about how prevalent it used to be, how prevalent it may be today. I'm not sure that the Fish and Wildlife Service had evidence in front of us that it was now scarce, because it apparently is capable of going down 15 or so feet, doing so quite quickly in response to noise, shovels, and so on. I infer that the earthworms that were discovered 100 years ago and sent to the man in Illinois with a statement that they're prevalent around here, I infer that those were found during making road cuts, just to say, quite deep. And maybe they were. If you're going to cut through a hillside, you're going to get down that 15 feet and may find them. But the methods now used to search for these earthworms are such... I'm not convinced the Forest Service is wrong in saying we just don't know how many there are now, because the searching has been so inadequate to find them. As I read the Fish and Wildlife Service, they say, we're not going to say you guys are out of luck forever, they say bring us some more information. This does present a tough situation, maybe an outlier situation, where we have information that, as you indicated, Your Honor, once indicated that the earthworm appeared to be abundant in the region near Pullman, I believe. I'm not so sure that the record indicates that those specimens were necessarily collected deep, invariably at great depths. I couldn't tell. I inferred that that was a manner, but I couldn't tell. There were reports that they utilized very deep burrows, but what we do have is indications that the later specimens, the four or so occurrences that we have seen in the past 100 years or so, have been collected at much shallower depths, in some cases on the surface. So this is a worm that is not restricted to extremely deep burrows. It does occur elsewhere, like similar species. It does travel to the surface and can be found there. Those earthworms that were discovered more recently than 100 years ago, what methods were used when they were discovered? Was it just a shovel, 10 inches or 12 inches, or something else? I believe that's correct. I don't believe any of those four occurrences reflect extraordinary methods to find the earthworm. They were just a little slow. They might have been slower than their cohorts or compatriots. That's correct. But other worms are also deep burrowing. They also occurred close to the surface, and we have a relatively good understanding of the range. What we don't have here, of course, is perfect information about the range and prevalence of the giant Palouse earthworm, but what we do have is essentially no information on the other side. We don't have any countervailing evidence indicating that this species is, in fact, prevalent throughout its range. How does that work? Does there have to be a certain level of evidence presented before there is a requirement to have countervailing evidence? How does it work procedurally, in your view? Well, the standard is twofold. The standard that reflects this precautionary principle at this preliminary petition finding stage, the statute itself says the Fish and Wildlife Service must make a positive finding if it finds that the petition presents substantial information indicating that the listing may be warranted. Right. So you have to first present substantial information before any obligation is triggered for countervailing information. So in your view, what substantial information has been provided to support the listing? The further refinement on that, however, Your Honor, is that the regulations provide a definition of what substantial information means. Somewhat unusually, it presents this as an objective standard. It's not something that requires the application of technical expertise by the Fish and Wildlife Service. It looks to what a reasonable person would conclude as to whether the listing is warranted based on the listing may be warranted. I sometimes say is, but the standard at this stage invariably refers to may be warranted. Right. So it's the... Can you delineate for us what the substantial evidence is that would warrant a determination that listing may be warranted? The substantial evidence is, in this case, information that would lead a reasonable person, we believe, to conclude that listing may be warranted based on the apparent rarity of the species, the fact that it is apparently limited to a restricted... These are weasel words, apparently. I do that very deliberately, Your Honor, because the standard, I think, as we point out, doesn't require conclusive levels of proof at any stage along this causal chain. So it requires a little more than speculation. So it's kind of a fine line we're walking here between speculation and plausibility. The way I would put it, Your Honor, is that it's enough information to permit a reasonable person to infer based on fact A that fact B is the case. It's not to speculate that that may be the case, but to infer that based on the apparent rarity and the apparent range of the species, the fact that we have a dramatic increase in agricultural-related activities in this region, that's enough, we believe, to allow a reasonable person to infer that listing may be warranted on those grounds. Now, there's safeguards built into the process, so if something goes wrong, if there is, in fact, countervailing evidence that comes out, there's an opportunity to correct that process. On the other side, too, if additional evidence comes out to support the listing decision, that can be garnered and presented later as well. That's right, and I think the point I raised in my brief is that, however, that does require a new process. With this process, the Fish and Wildlife Service's negative finding terminated this particular petition. It's over. That petition is done. A new petition may be submitted. In fact, as the Service has pointed out, it has been, but that's a different process. It's a new process that may be based on new and hopefully better information. All right. What are we to make of the fact that among the finding of these worms in recent time, one is well outside the Palouse, I think it's in Ellensburg. I mean, you're heading up into the hills by the time we get to Ellensburg. Well, I guess well outside is a relative term. It's not particularly far outside. Well, I know where Ellensburg is. Yes. The petition presented evidence that I don't think the petition attempted to mislead the Service on this at all. It presented information regarding the Ellensburg sighting. No, I'm not accusing you of misleading at all. I'm trying to figure out what do we make of the fact that one was found there. What we make of it, I believe, is that we find an association between the earthworm and this Palouse prairie-type habitat. And that may extend to similar grassland habitat with deep, well-drained soils near the Ellensburg area. That appears to be the case. So what we have is not a 100% type relationship between the earthworm and the Palouse prairie region narrowly defined as this area that excludes Ellensburg. But what we do find is a general association between this type of habitat in this portion of eastern Washington and Idaho that is faced by, I think without much dispute, a variety of threats. A great deal of conversion of this native grassland vegetation to agricultural purposes with deep tillage and so on. So it's less than perfect information. When we're talking deep tillage, I mean, the tillage is basically agriculture, wheat farming, I mean, so how deep are they going? Well, I don't know the answer to that, Your Honor. They're not going 15 feet. I'm certain of that. But again, because we have an earthworm that utilizes not just these extremely deep rows, but does rise to the surface to perform basic behavioral functions, it uses all portions of that. So a disruption of even upper portions of the soil can be enough to pose a threat to the earthworm. And we see this with some of the surrogate species that the petition cited, other earthworms that are clearly affected by agricultural operations. Those earthworms, it's undisputed, they live higher up. In some cases, but even, I believe, in some of the deeper growing species, we find that, and I think the petition presented information, that even those species can be harmed and threatened by surface agricultural operations and surface applications of fertilizers and pesticides. Are any of those listed? No, Your Honor. I believe that's correct. None of those other species are listed. Some of them are, in fact, some of the surrogate species are, in fact, non-native earthworms that in some cases may be considered undesirable or invasive, but have filled a similar ecological niche in the area. But we, you know, our contention is that the petition allows the reasonable person to infer from those types of threats to similar, but not identical species, that that type of threat also extends to the giant polluted earthworm. In your brief, you used the term exotic earthworms. Does that mean non-native? Yes, I think the general, my intention was generally to be synonymous with those terms. One other question, unless it's x-rated, you said when they come to the surface they perform behavioral functions. What are the behavioral functions you're talking about? I hesitate to go too far based on my knowledge of earthworm biology, but there is some indication that's not entirely unambiguous, admittedly, but that earthworms of this type, possibly including the giant polluted earthworm, feed on the surface, not invariably, but sometimes. So we find similar types of earthworms coming to the surface to feed. And, you know, that's when people tend to encounter these very large earthworms. They tend not to be encountered when they're specifically looking for them. So we have what is an objective reasonable person standard, but in the face of this, the services explanation of what it believes it did with this petition seems to rely on a very different standard, one that turns on whether the service had a rational or a reasonable basis for what it did. Now I know that's a standard you see frequently in Administrative Procedure Act cases. In this case, the underpinning of this case is an APA, is the APA. However, we have the Endangered Species Act that provides a distinct standard that is directly at odds with that reasonable basis or rational basis standard that they put forward. The reason for this is that it's possible that even if the service has a rational basis for what it did in denying the petition, it's equally possible, if not more so, that a reasonable person might still find, in light of the information that is available, that the listing may be warranted. So the standard that they're offering is fundamentally inconsistent with the correct standard. But they've gone farther than this and done something else with the standard, and that's the requirement of inappropriate level of certainty in, well, in evaluating virtually all of the facts that were presented in the petition. As to the species variety, they asked, they appear to ask that we provide fairly certain information that it is, in fact, rare. As to its range, they ask that we delineate, that the petition delineate its range with specificity. As to its habitat preferences, you know, the petition says this is a species that's associated with grasslands that are, have rich and well-drained soil. They ask for specificity about those habitat preferences. And as for the threats, they ask for specificity about the threats to this particular species from particular agricultural operations like pesticide application, tillage, fertilizer application. With four occurrences in the last hundred years, it's not surprising that that specific information causally related with absolute certainty doesn't exist. But that's not required. Why don't we hear from the government? You're taking your time, but we'll give you a chance to respond. Thank you, Your Honor. Yeah. May it please the Court, I'm John Arbab, partner of justice for the service. Welcome back. Yes, it's a pleasure. Glad to see you again. Are we going to see you again later in the week, or is this it? Thankfully not. Two arguments in two days is enough for me anyway. Your Honor, maybe I should go to the last point, or one of the final points that counsel raised, which is the appropriate standard of review in a case such as this. Counsel, I think rightly, submits that this is an APA case. Administrative Procedure Act review applies here. But where counsel is incorrect is in his conclusion that somehow because the reasonable person regulatory test is in play, that makes generic arbitrary and capricious review inapplicable. This Court's review is not de novo, as the foundation's briefs suggest. The question here is not what would this Court have concluded under the substantial information test, had it been presented with petition and supporting scientific papers in the first instance. The question is whether the findings and the ultimate negative 90-day finding made by the expert agency is arbitrary or capricious, and the answer to that question is, in our view, no. So that's the first point I'd like to make. Secondly, I think the very last thing counsel mentioned was that, in effect, even though the agency in its 90-day finding expressly stated the correct standard in numerous places in its finding, that de facto or sub salentio, the agency was actually applying a much higher standard to evaluate the science in this petition, counsel referred to it here, as he does in his briefs, as something like an inappropriate level of certainty or absolute certainty is not required. I think, in fact, the red brief spends, I think, most of its pages trying to show why that is, in fact, not true. What the agency did here was to apply the proper announced standard to the scientific data that was submitted along with the petition, and because what we're talking about here is scientific information, the agency has to bring some measure of its scientific expertise to bear, even at this initial stage, as to what, in fact, is reasonable, what would a reasonable person conclude from these scientific papers. And the conclusion the agency reached was that, although I'm paraphrasing here somewhat, but although we recognize that the 90-day finding threshold is quite low, the sum total of what's been submitted to us in terms of science, that the petitioner believes is the best available science, simply is not probative enough to come up to even that relatively low threshold. And the agency said, of course, we're only denying this particular petition. These petitioners or anyone else out there in the public who has better or newer information, we're inviting you to bring it to our attention. We'll reconsider the matter at that time, but as far as this particular petition is concerned and so far as this particular body of data that's been submitted to us is concerned, we don't find that it meets the appropriate standard. Now, if I could go back to the beginning of counsel's remarks, I think the first thing he mentioned was the so-called precautionary principle. And I think in the opening brief and perhaps in the reply brief as well, it's put in terms of the benefit of the doubt must be given to the species in question by the Fish and Wildlife Service. Well, I don't think the precautionary principle or the benefit of the doubt principle is a principle in Endangered Species Act law, but it does not apply to this initial 90-day finding stage under Section 4 of the statute. As far as I can recall, the benefit of the doubt idea maybe wasn't first enunciated by the Supreme Court in the Tennessee Valley Authority versus Hill case, but that is one of the places where it is stated. It's not in either set of briefs, but it's TVA versus Hill, 437 U.S., 153, 1978. And the point there is that the precautionary principle or the benefit of the doubt idea was articulated under Section 7 of the Endangered Species Act. And what you're dealing with there is a species that has already been listed by the service as either threatened or endangered. And the question arises under Section 7 is some federal agency is proposing a project that could potentially affect a species that is already listed as threatened or endangered. Under Section 7, that agency has to come to the Fish and Wildlife Service, or it could be to the National Marine Fishery Service, depending on the exact species involved, and has to ask the expert agency for a jeopardy determination. In other words, we, the BLM, for example, are proposing to authorize mining, and we have some reason to believe that if we authorize this project, it could jeopardize an already threatened or endangered species. Fish and Wildlife Service, please give us your expert opinion on this jeopardy question. It is in that context that under Section 7 jeopardy determinations that, yes, it is true that there is a precautionary principle and that to the extent that there is uncertainty in the service's mind about the jeopardy question, the benefit of the doubt should be given to the species that is already listed as threatened or endangered. But to take that idea and to import it wholesale into Section 4 of the ESA, I submit, is not warranted. And so I guess this is all a long way of saying that the precautionary principle idea really doesn't have an application here. What the rather straightforward question before the Court is that Section 4 of the ESA talks about substantial information. Congress put that substantial scientific information, best available science concept, into Section 4 to govern these initial 90-day findings, and the agency has promulgated a regulatory definition of what that substantial information means. And so the question here is, was the agency arbitrary and capricious on the body of data presented to it when it concluded that that standard was not met? I think the only other thing I would like to address, because I haven't had a chance to address it before, are a couple of points in the reply brief. I think probably the most – I had two in mind. I think probably the more significant one is at pages 8 and 9 of the reply brief, there's some discussion made in reference to a 2008 decision by the Fish and Wildlife Service on the marble muralette. Which is a small seabird. The contention in the reply brief is that this marble muralette decision, and I think I'm quoting directly here, quote, makes plain that the service cannot reject a petition simply because it disagrees with some of the scientific literature on which the petition is based, unquote. I think that that is the wrong conclusion to draw from the marble muralette decision. The petition there was a petition to remove what is known as the California-Oregon-Washington distinct population segment of the marble muralette from the list of threatened and endangered species. And the service issued a positive 90-day finding that the requested delisting action may be warranted under the substantial information test. But if you take a look at – it's page 57, 317 of the Federal Register decision, you'll see that this petition involves a very unusual circumstance, which doesn't really have any resemblance to what we're dealing with here. The lesson to be drawn from this marble muralette decision is this, and only this, really, I would submit. If the service itself has made a particular scientific determination, and if the service has not formally revisited, to quote the service, its own determination, then should the service later on decide that its original determination was flawed, then the agency's flawed determination may nonetheless satisfy the reasonable person test. I think the basic idea there is that if even the expert agency itself at one point had believed that there was a scientific basis for taking an action, then a reasonable person could rely on that. In a situation where the agency itself has not gone back and formally withdrawn or revisited the determination that it later concluded was flawed in some way. I guess I will, since I went so long with the Court yesterday, I guess I will stop there unless there are any further questions. That was a marathon. In that calculation, you still owe us a lot of time. Well, I'm a marathon runner, or at least a former marathon runner, so I know what it's all about. Thank you. Thank you. Response. The petition here presented essentially the sum of human knowledge, at least known to the petitioners at the time on the giant blue-surf farm. It presented peer-reviewed scientific evidence, including this Fauci study that came up in the government's papers that they really misrepresented. They suggested it wasn't looking for the giant blue-surf farm, and when it was, they suggested they didn't look deep when they did. We do have evidence in the record referred in the petition that rises to this substantial test that would allow a reasonable person to infer a listing as warranted. But in terms of the standard, we're not trying to override the generic arbitrary and capricious review standard, as I said. What we have here is an unusual question of agency expertise. There really is none in terms of the species. They acknowledge that. They admit that. The petition presented everything we knew. The service didn't know anything new beyond that and took that for granted. Can I interrupt and ask, and I know this is not in front of us and it's not relevant to the decision we're being asked to make. I gather there's another petition with respect to this earthworm now pending? That's correct. And you guys found out some more information? There has been some post-previous petition. There's been some additional information. Okay. But I understand it's not in front of us now. The question of agency expertise, this title limited versus loan case, I think dealt with that very specifically. There's deference that's appropriate to the agency's expertise. But less so when there's a specific statutory or regulatory standard, and that's what we have in this case. They can't override that standard by references and appeals to the agency expertise, which in this case does not exist. One brief remark on the precautionary principle, certainly embodied in TVA Hill, but I had asked the court to look again at the Defenders of Wildlife case. We believe it's well established in the listing process as well and it runs throughout the entire Endangered Species Act. Thank you. Okay. Thank both sides for nice arguments. Palouse Prairie Foundation versus Salazar is now submitted for decision. That completes the argument calendar for this morning. We're in adjournment until tomorrow.
judges: Alarcon, Fletcher W. , Rawlinson